UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARCIE K. TAYSOM, | Case No. 4:12-cv-00020-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| BANNOCK COUNTY, an Idaho political subdivision; SHERIFF LOREN NEILSEN, in his official and individual capacity; JACOB MICHAELSON, in his official and individual capacity; KEVIN FONNESBECK, in his official and individual capacity; ELLIE PETERSON, in her official and individual capacity, | |
| Defendants. | |

## INTRODUCTION

Before the Court is Defendants' Motion for Summary Judgment (Dkt. 26).  The

Court heard oral argument on May 28, 2013, and took the matter under advisement.  For

the reasons set forth below, the Court will grant the motion in part, dismissing the claims

for (1) substantive due process violations against all Defendants except for the claim

against Defendant Jacob Michaelson, (2) the Title VII hostile work environment claim,

and (4) all state law claims. The Court, however, finds issues of fact exist with respect to

the American With Disabilities Act claim and the substantive due process claim against

Michaelson.

## BACKGROUND

In the fall of 2009, Plaintiff Marcie K. Taysom applied for work at the Bannock

County Jail as a booking clerk.  At the time, however, Bannock County did not have any

openings for a booking clerk.  *Fonnesbeck Dep.* 35:1-14, Dkt. 33-14.  Bannock County

therefore offered Taysom employment as a floor deputy officer.  Unlike a booking clerk,

a floor deputy officer must pass a POST detention officer physical readiness test as a

condition of employment.  Even with the POST requirements, Taysom told Defendant

Lieutenant Fonnesbeck that she was interested in the floor deputy position, and she

agreed to initiate the steps for passing POST. *Fonnesbeck Dep.* 35:23-25; 37:9-14.

On November 10, 2009, Taysom reported to the Bannock County Sheriff's

Department to participate in the POST Detention Officer Physical Readiness Test.  *Ex. 6

to Taysom Dep*., Dkt. 33-13.  Taysom passed the vertical jump and sit-up portion of the

test, but she could not complete the minimum number of pushups. *Id.* Because the test

had to be completed as a whole, and Taysom failed the pushup portion of the test, she

never completed the running portion.  *Fonnesbeck Dep.* 39:22-25; 40:1-4. Taysom

apparently ran frequently for exercise and was in "pretty good shape." *Id.* 35:20-21.

According to Idaho statute, a floor deputy officer must become POST certified

within one year of hire, unless a waiver is obtained. I.C. § 19-5109(3). Bannock County

further required that Taysom complete the POST physical readiness test within 90 days

of hire as a condition of her continued employment. *Taysom Dep*. 107:10-13. Taysom was notified of these requirements.

In January 2010, Taysom began training as her floor detention officer even though she had not completed the physical readiness test.  The first field training officer, or FTO, assigned to train her was Defendant Jacob Michaelson, a Bannock County deputy sheriff. One must apply for the field training officer position, but there is no additional compensation associated with the assignment. *Id. at* 13:20-14:15, Dkt. 33-7. Field training officers shadow trainees on their shifts, providing them with instruction on jail policies and procedures, how to interact with inmates, etc. *Michaelson Dep*. 17:8-23:18, Dkt. 33-14. The field training officer completes a "daily observation report," which details how the trainee performed his or her tasks for the shift. *Id.* at 14:23-15:13. A field training officer stays with a particular trainee for two weeks, and then the trainee is assigned a new training officer for another two weeks. *Id.* There are four phases to field training for a floor deputy position, for a total of eight weeks. *Id.*

On January 16, 2010, Taysom and Michaelson were scheduled to work their first shift together.  At the beginning of the shift, according to Taysom, Michaelson "without warning and without any legitimate training objective," struck her knee, using a technique known as the common peroneal strike. *Compl.* ¶ 20, Dkt. 1. The common peroneal strike is a type of arrest technique used to disable the leg.  *Fonnesbeck Dep*. 57:8-58:21. The person delivering the strike uses his knee to hit the arrestee four inches above the knee and below the hip, where the sciatic nerve splits from the common peroneal or tibial nerve.  *Id.* at 57:8-58:15.  The strike to the nerve disables the leg. *Id.*

The common peroneal strike is typically taught by a certified trainer in a classroom setting.  *Id.* at 60:14-61:7.  Instructors teaching the strike take precautions when training new officers.  *Id.* at 61:11-13.  The instructors start with a touch drill, teaching the trainees the correct way to deliver the strike. *Id.* at 61:11-20.  Once the trainees repeat the touch drills numerous times, they move to using bags to practice the strike, or they perform the strike on a person wearing pads.  *Id.* at 61:21-62:6.

Michaelson, of his own accord, would teach trainees arrest techniques, including common peroneal strikes. *Id.* at 25:10-26:18. Michealson was not told to teach common peroneal strikes as part of his FTO duties, and learning of these strikes was not part of the "rookie book," which rookies followed in training. *Id.*  Michaelson did not use a pad when he taught trainees common peroneal strikes because he says that he would not strike at 100 percent force, so pads were not needed. *Id.* at 27:2-9. Michaelson admits that he performed the common peroneal strike on Taysom but says he only did it in a training context, and not as a form of horseplay. *Id.* at 39:7-17. Michaelson, however, admits that he would give other trainees common peroneal strikes as a form of horseplay. *Id.* at 40:17-19.

When Michaelson performed the common peroneal strike the first time, Taysom says she immediately felt pain in her knee and thigh area. *Id.* ¶ 21. She asked Michaelson not to strike her again. *Id.* ¶ 22.  But, according to Taysom, Michaelson ignored her plea and continued to strike both her right and left knee regions using the common peroneal technique. *Id.* ¶ 23. Taysom claims, during one incident on January 24, Michaelson struck her with such force "that he busted the screen of [her] cellular phone, which she

had placed in her pant pocket." *Id.* ¶ 25. Taysom denies that Michaelson performed these strikes as part of her training.  She alleges that he did them without provocation or justification.  Taysom still suffers from knee pain and can no longer run or jump.

On January 29, 2010, Taysom began training with Bannock County Deputy Sheriff Jackson.  *Id.* ¶ 26. Taysom told Deputy Jackson about Michaelson's treatment of her. *Ames Deposition*, Ex. 8, Dkt. 33-6 at 92. Deputy Jackson told Taysom to report these incidents through the chain of command. *Id.*  Following Jackson's advice, Taysom went to a supervisor, Sergeant Ames, within two weeks of being struck by Michaelson and reported to Ames that Michaelson had struck her. *Taysom Dep.* 77-78.  Taysom alleges that Ames reacted by telling Taysom that this was going to turn into a big deal, and that Michaelson would likely be fired. *Id.* at 78:3-10.

On February 18, 2010, Taysom delivered a letter to Ames and Defendant Fonnesbeck. When Taysom showed the letter to Fonnesbeck, he allegedly instructed Taysom that if she could not pass POST by April 1, 2010, she would be fired. *Taysom Dep.* 99. Taysom then continued to work and completed her training on February 25, 2010. According to Taysom, Fonnesbeck later told her that if she took any time off for this injury that she would be fired. *Id. at* 124. Taysom kept working through the pain in the hope that she would be able to keep her job. It took her brother, Jeremy Taysom, contacting Ames and demanding that Bannock County do something before Taysom was finally given the opportunity to make a worker's compensation claim. *Id.* at 96:11-16.

Defendants maintain that Taysom originally reported that she injured her knee in an arrest techniques class and then changed her story, saying Michaelson did it.  Taysom

maintains she always said it was Michaelson.  It is undisputed, however, that Taysom submitted her first written report of the injury on March 8, 2010, claiming that Michaelson had injured her using the common peroneal technique. *Taysom Dep.*, Ex. 10.

Defendants claim they immediately investigated the report.  Michaelson says that he explained that there had been a longstanding practice of horseplay among various jail staff that included giving common peroneal strikes between floor deputies. *Michaelson Dep.*, 61-63. Michaelson admitted that he engaged in that conduct with other floor deputies, but that Taysom was never part of that horseplay. *Id.* at 39:4-25; 40:1-23. Michaelson was reprimanded and demoted on March 11, 2010, for his participation in that horseplay. *Peterson Dep.*, Ex. 5.  Michaelson resigned as a FTO within the department. *Id.* at 56:25. Taysom disputes that Bannock County ever thoroughly investigated her allegations, and she disputes that Michaelson was properly reprimanded.

After Taysom made her March 2010 report, Bannock County assisted Taysom in submitting a worker's compensation claim. *Fonnesbeck Dep.* 79:1-15. Taysom claims that she requested accommodations on multiple occasions, but she did not take any time off due to her injuries because Fonnesbeck had told her she would be fired if she did. *Taysom Dep.* 123:2-25-125.

In June, however, Taysom's attorney contacted Fonnesbeck and indicated that Taysom wanted a second opinion on her knee. *Fonnesbeck Dep.*, 89:1-5.  As a result, Fonnesbeck worked with Captain Peterson to get a waiver from the sheriff for a 30-day medical leave. *Taysom Dep.,* 137:15-17; *Fonnesbeck Dep.*, 99:8 – 100:25.  After the first 30-day leave expired, Taysom requested a second medical leave on July 5, 2010, which

was set to expire on September 3, 2013. She requested a third extension on September 1, 2013.

On September 3, 2010, Plaintiff was issued a Notice of Termination. *Taysom Dep.*, Ex. 14. Bannock County claims that it terminated Taysom because it determined that Taysom would not be able to return to work in sufficient time to pass the POST physical readiness test and attend the October 2010 POST Academy to become POST certified.

The Idaho statute that imposed the one-year POST certification requirement also creates exceptions to certification if the deputy can show good cause. I.C. § 19-5109(3). Bannock County has waived the one-year POST certification requirement for other employees. *Nielsen Dep.,* Ex. 5-6. Taysom says she could not complete the POST physical readiness test because of the knee injury she suffered as a result of Michaelson repeatedly striking her knee area using the common peroneal technique.

Taysom also alleges that, in addition to requesting medical leave, she asked both Fonnesbeck and Ames to transfer her to booking to allow her time to heal. *Ames Dep.* 52:5-12. Ames told Taysom that she would not qualify for light duty, such as a transfer to the booking department because she had not yet been trained for the booking department. *Id.* at 52:5-53:18. It was decided not to put Taysom in booking training even though floor deputy officers usually undergo both floor deputy training and booking training. *Id.* Defendants also claim no booking positions were open, but within 22 days after Taysom was fired, two deputies in booking asked to move to the floor deputy position. *Id.* at 64:3-11.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . .." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255.  Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc).  To carry this burden, the moving party need not introduce any

affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id*. (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

## ANALYSIS

### 1. Section 1983 Claims Against Bannock County

Bannock County argues that the § 1983 claims against it must be dismissed because Taysom has not submitted sufficient evidence showing that the alleged constitutional violations arose from an official policy or regulation adopted by Bannock County.  The Court agrees.

Local governmental entities are immune from direct claims under § 1983 unless the plaintiff can show that the alleged constitutional violation arises from an official policy or regulation adopted by the entity. *Monnell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690 (1978).  In this case, Taysom made no attempt to argue that the alleged constitutional violations against her resulted from the implementation of any Bannock County official policy or regulation.  Therefore, the § 1983 claims against Bannock County must be dismissed.

### 2. Americans With Disabilities Act

The Americans with Disabilities Act prohibits an employer from discriminating against an "individual with a disability" who, with "reasonable accommodation," can perform the essential functions of the job. 42 U.S.C. §§ 12112(a) and (b) (1994 ed.).  The ADA also insures full opportunities for people with disabilities in the workplace by requiring employers to find reasonable accommodation for their employees' disabilities. The ADA prohibits employers from discriminating against a disabled employee by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless

such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Bannock County contends that Taysom is not covered under the ADA because she was not "qualified" for the floor deputy position because she could not pass the POST physical readiness test as a result of her knee injury. The ADA defines "Qualified Individual" as a person with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual "holds or desires." 42 U.S.C. § 12111(8). So if Taysom could not perform the essential functions of the floor deputy position "with or without reasonable accommodation," she would not be qualified under the ADA.

But, as noted, the statutory definition of a "qualified individual" covers individuals who can perform the "essential functions" of a position that the individual either "holds *or desires*." (Emphasis added).  The Ninth Circuit has therefore held that a "qualified individual with a disability" includes "individuals who could perform the essential functions of a reassignment position, with or without reasonable accommodation, even if they cannot perform the essential functions of the current position." *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 892 (9th Cir. 2001).

The employer need not create a new position or change the essential functions of new position in order to accommodate a reassignment. However, the duty to accommodate is a continuing duty that is not exhausted by one effort." *Dark v. Curry County*, 451 F.3d 1078, 10890 (9th Cir. 2006) (citation omitted). Therefore, "… in

considering reassignment as a reasonable accommodation, an employer must consider not only those contemporaneously available positions but also those that will become available within a reasonable period." *Id.* at 1089-90. The determination of a reasonable accommodation turns on a case-by-case analysis of the individual, the individual's disability, and employer's job requirements. Whether the individual can perform the essential job requirements is identified by the employer and the individual through the interactive process. *See* 29 C.F.R § 1630.2(o)(3).

Employers must "engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations." *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1121 (9th Cir. 2000), *overruled on other grounds,* 535 U.S. 391 (2002). The obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee. As explained in the EEOC regulations, the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* (quoting 29 C.F.R. § 1630.2(o)(3). Finding the most appropriate accommodation is best achieved through an informal, flexible interactive process involving both the employer and the employee with the disability. *Id.*

Engaging in the interactive process is mandatory. Id. at 1112. "[T]his obligation is triggered either by the employee's request for accommodation or by the employer's recognition of the need for accommodation." *Id.* Employers must demonstrate that they acted in good faith, and may do so by pointing to cooperative behavior that promotes the

identification of an appropriate accommodation. *Barnett,* 228 F.3d at 1115. If an employer fails to engage in the interactive process in good faith, liability for the failure to provide reasonable accommodations ensues when the employer bears responsibility for the breakdown. *Id. Barnett* held that "employers who fail to engage in the interactive process in good faith face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Id.* at 116.

In this case, there is a genuine factual dispute whether Bannock County engaged in the interactive process in good faith. Bannock County knew that Taysom suffered from a work-related knee injury that prevented her from completing the POST requirements. She had filed for workers compensation benefits, and had asked for medical leave on two separate occasions. Taysom provided a note from her treating physician indicating that Taysom needed time off work.  She received medical leave on two separate occasions. Thus, there exists sufficient evidence to create a genuine dispute of material fact on whether Taysom requested an accommodation.

Bannock County responds that Taysom never specifically requested to be transferred to the booking department. There are several problems with this argument. First, it is undisputed that Taysom first applied for a booking deputy position, so Bannock County had some knowledge that Taysom would be interested in transferring to the booking department.  Second, Defendant Fonnesbeck acknowledged that Taysom requested light-duty work –  a request Bannock County denied, claiming she was not qualified.  Most floor deputy trainees, however, also undergo training for booking at some point, so it would not have been unusual to train Taysom as a booking deputy.  Two

booking deputies requested to be transferred out of booking very soon after Bannock County terminated Taysom's employment.

Finally, and most troubling to the Court, Bannock County's argument shows that it misapprehends the interactive process. Taysom did not have any obligation to specifically request transfer to the booking department. "To put the entire burden for finding a reasonable accommodation on the disabled employee or, effectively, to exempt the employer from the process of identifying reasonable accommodations, conflicts with the goals of the ADA." *Barnett*, 228 F.3d at 1113. Employees do not possess the extensive information regarding possible alternative positions, or other possible accommodation that the employers possess. *Id.* "Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has." *Id.*

Once Taysom notified Bannock County of her disability and requested accommodation in the form of medical leave and light-duty work, Bannock County had an obligation to engage in the interactive process in good faith. Only through consideration in a reasonably interactive way could Bannock County determine (1) whether Taysom desired reassignment; (2) whether there were vacant positions available at an equivalent or lesser position; (3) whether such positions were truly vacant or likely to become vacant in the reasonable future; (4) whether reassignment would interfere with the rights of other employees or important business policies of the company, etc. The right to reassignment after all is not absolute. It requires deliberative consideration, and depending upon many factors, may or may not rise to a right to be reassigned. On the

other hand, after considering all of the relevant factors, it may very well be determined that reassignment is a reasonable accommodation under all of the circumstances. If it is so determined, then the disabled employee has a right in fact to the reassignment, and not just to the consideration process leading up to the potential reassignment.

Summary judgment is therefore inappropriate in this case. The evidence is disputed concerning whether Bannock County engaged in the interactive process in good faith before deciding to terminate Taysom's employment.

### 3.  Substantive Due Process

Taysom alleges that Defendants violated her substantive due process right to "bodily integrity."

The protections of substantive due process have for the most part been accorded to matter relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver,* 510 U.S. 262, 272 (1994).  Under the Fourteenth Amendment's substantive due process prong, the "shocks the conscience" test is applied. *County of Sacramento v. Lewis*, 523 U.S. 833, 846, (1998). The threshold question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 848 n. 8. S*ee also Cullum v. Teton County*, 4:10-CV-293-BLW, 2011 WL 841431 (D. Idaho Mar. 7, 2011).

Substantive due process vindicates only those interests that are fundamental. *Brittain v. Hansen,* 451 F.3d 982, 995 (9th Cir.2006) (internal quotation omitted). It may not to be used as a font of tort law. *Id.*  Generally, substantive due process does not cover tortious acts of government agents. *County of Sacramento,* 523 U.S. at 847. "The due

process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," but deliberate conduct by a government official that is intended to harm is the sort of official action most likely to rise to the conscience-shocking level. *Id.* at 848–49.

An unprovoked assault and battery by a prison guard, however, may violate substantive due process. *Meredith v. State of Arizona*, 523 F 2d. 481, 484 (9th Cir. 1975). When force is excessive, or used without justification or for malicious reasons, there is a violation of substantive due process. *Sinaloa Lake Owners Ass'n. v. City of Simi Valley*, 882 F 2d. 1398, 1408 (9th Cir. 1989).

For example, in *Gregory v. Thompson*, a justice of the peace in Arizona, taunted by the plaintiff who refused to leave the courtroom, rose up from his desk, forced the plaintiff out the door, threw him to the floor in the process, and began to pummel him. 500 F.2d 59, 62 (9th Cir.1974). The Ninth Circuit stated that it "is well established that § 1983 provides a remedy for one who has been the victim of an assault and battery at the hands of a person acting under color of state law ... The right violated by an assault has been described as the right to be secure in one's person, and is grounded in the due process clause of the Fourteenth Amendment." *Id.*

By contrast, in *Cullum*, the plaintiff, an inmate, brought a substantive due process claim against a prison guard who had struck him three times in the chest without provocation and blocked his path.  The plaintiff made "no specific allegations regarding injuries suffered, medical attention, trauma, inability to work, or psychological scarring." 2011 WL 841431 at *4.  Dismissing the inmate's substantive due process claim without

leave to amend, this Court acknowledged that the prison guard's conduct was inappropriate but could not characterize the guard's conduct "as inhumane, an abuse of power, or conscience-shocking." *Id.*

This case falls somewhere in between *Gregory* and *Cullum*.  Michaelson's conduct in this case was not as clearly egregious as the justice of the peace's conduct in *Gregory*. It is without question outrageous for a justice of the peace to rise up from the bench and apparently pummel a member of the public.

On the other hand, Michaelson's conduct was more egregious than the guard's conduct in *Cullum*. According to Taysom, Michaelson struck her multiple times using the common peroneal strike – even after Taysom asked Michaelson to stop.  Taysom says Michaelson continued to strike Taysom at least one time per shift and sometimes up to five or six times per shift. Taysom also claims that Michaelson caused permanent damage to her knee, which ultimately resulted in her losing her job.  Michaelson was not certified to train another individual in the use of the peroneal technique.  And, even if he was, FTO trainers do not teach trainees the common personeal strike on the jail floor "for obvious reasons."  *Neilsen Dep.* 58:4-9.  "There's not room to do that kind of stuff on a jail floor." *Id.*

This case presents a very close question, but ultimately the Court concludes that Taysom has raised a question of fact on her substantive due process claim. From the facts alleged, if proven, a jury could infer that Michaelson, as a training officer, had authority over Taysom, as a trainee, and that Michaelson exercised that authority to strike Taysom repeatedly, causing Taysom permanent injuries. A jury could further infer that

Michaelson acted with an intent to injure Taysom in some way. And, finally, assuming Michaelson repeatedly struck Taysom as a form of horseplay, as Taysom alleges, his actions were not justifiable by any government interest. "Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action that would most likely rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 834 (1998).

Had Michaelson accidentally injured Taysom using the common peroneal technique during the course of an official arrest techniques class, this would be a much different case.  There is no question that the Bannock County jail has an important interest in training its officers to use techniques that allow them to carry out their duties effectively.  But there is evidence that Michaelson was not certified to train Taysom, or anyone else, in the common peroneal technique and therefore, at least arguably, had no legitimate interest in repeatedly striking Taysom outside a controlled classroom setting. *Compare Feirson v. District of Columbia*, 315 F.Supp.2d 52, 62 -63 (D.D.C. March 30, 2004) (finding no substantive due process violation when plaintiff injured during an official training session because police department has important interest in training officers).

The Court, however, cannot find that Defendants Fonnesbeck, Peterson and Nielsen's alleged "lack of care," in any way shocks the conscience.  Taysom alleges that it shocks the conscience "to have an employee who is fit for duty, assaulted by another employee and injured, and six months later terminated without cause." Taysom also criticizes Fonnesbeck, Peterson and Nielsen for "not even bothering" to conduct an

investigation into the assault, and then purportedly retaliating  against her after she filed a

Notice of Tort Claim. Such conduct may give rise to a wrongful termination claim, but it

does not rise to constitutional proportion. Even if Taysom could prove that she was

unreasonably deprived of her employment, this is not the sort of violation that substantive

due process was intended to remedy. *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194,

195-99 (1979). Thus, Taysom fails to raise an issue that any Defendant, other than

Michaelson, violated her substantive due process rights.

### 4.  Title VII Claims

To survive summary judgment on her hostile work environment claim, Taysom

must raise genuine issues of material fact that (1) she was subjected to verbal or physical

harassment due to her gender, (2) the harassment was unwelcome, and (3) the harassment

was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment

and create an abusive work environment.  *Kortan v. California Youth Authority*, 217 F.3d

1104, 1110 (9th Cir. 2000).  Taysom must show that the conduct at issue was both

objectively and subjectively offensive: she must show that a reasonable person would

find the work environment to be "hostile or abusive," and that she in fact did perceive it

to be so.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787(1998).  Where an employee

is allegedly harassed by co-workers, the employer may be liable if it knows or should

know of the harassment but fails to take steps "reasonably calculated to end the

harassment."  *Dawson v. Entek Intern*., 630 F.3d 928, 937-38 (9th Cir. 2011).

The conduct giving rise to a hostile work environment claim must be gender

based. *See EEOC v. National Educ. Ass'n, Alaska*, 422 F.3d 840, 844-45 (9th Cir. 2005).

Yet, Taysom fails to show, or even argue, that Michaelson targeted only female employees. Therefore, it does not appear that Michaelson's conduct was gender-based Therefore, it cannot form the basis of a Title VII hostile work environment claim.

Similarly, Taysom cannot rely on Michaelson's Facebook message as evidence of a gender-based hostile work environment.  In the message, Michaelson wrote to Taysom, "Listen here you little SHIT!!!! I am going to kill you just so you know."  Ex. 2 to Michaelson Dep, Dkt. ___.  Michaelson also wrote, "Well I will tell you one thing, I never want to work with you again!!!!!!!!!!!!!!!!!!!!!!!!!"  Taken out of context, these comments are disturbing, but when read in context, Michaelson purports to be joking. Even assuming, however, that Michaelson was serious when he wrote these comments, Taysom presents no proof that Michaelson made these comments because of Taysom's gender. Therefore, this message also cannot form the basis for a hostile work environment claim.

Nor has Taysom submitted any evidence to support a claim that she was terminated because of her gender.  Therefore, to the extent that Taysom makes such a claim, it is dismissed.

Finally, Taysom's Title VII retaliation claim must also be dismissed.  She makes no effort to refute Defendants' argument that she did not engage in protected activity.  To make out a prima facie case of retaliation, an employee must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  Therefore, with no proof that she

engaged in a protected activity, Taysom cannot establish a prima facie case for retaliation.

### 5.  Remaining State Law Claims

In her response brief, Taysom made no effort to refute Defendants' arguments to dismiss her state law claims.  And, at oral argument, Taysom essentially conceded that the state law claims should be dismissed.  The Court will therefore Defendants' motion for summary judgment on Taysom's state law claims.

### 6.  Motion in Limine

Defendants argue that Dr. Amy Reid should be excluded from testifying as an expert witness because Taysom failed to provide an expert report when it disclosed Dr. Reid as a rebuttal expert witness.  Taysom responds that Dr. Reid is Taysom's treating physician, and therefore no expert report is required.

Defendants concede that treating physicians need not provide a written report before testifying.  Fed.R.Civ. 26(a)(2)(B).  However, Defendants claim to be confused because Taysom claims Dr. Reid is a treating physician, but Taysom also listed her as a rebuttal expert witness without providing a report.  At trial, Dr. Reid may testify as a treating physician and she may testify as to her opinions that were formed during the course of treatment without providing a report. *Goodman v. Staples the Office Superstore, LLC*, 644 F. 3d 817, 826 (9th Cir. 2011).  Dr. Reid may testify in Taysom's case-in-chief, or as a rebuttal witness, or both.

## ORDER

IT IS ORDERED that

1. Defendants' Motion for Summary Judgment (Dkt. 26) is GRANTED in part and DENIED in part.

2. Defendant's Motion in Limine (Dkt. 21) is DENIED.

DATED: July 1, 2013

B. Lynn Winmill
Chief Judge
United States District Court